**LaCOASTAL PETROLEUM CORPO-
RATION, Appellant,**

v.

**LONE STAR PRODUCING COMPANY et al.,
Appellees.**

No. 4189.

Court of Civil Appeals of Texas.

Waco.

Nov. 14, 1963.

Rehearing Denied Dec. 12, 1963.

Crozier, Sweet & Freeman, Dallas, for appellant.

Roy E. Pitts, Thomas M. Gormley, and Frederick W. Fraley III, Dallas, Wilson, Miller, Spivey & Steger, Tyler, for appellees.

TIREY, Justice.

This is an appeal from a summary judgment. The LaCoastal Petroleum Corporation brought the action for specific performance of a contract to assign an oil and gas lease and, in the alternative, for damages. The contract in question is commonly known in the oil business as a farmout agreement. The agreement was entered into by and between Lone Star Producing Company and Coulston Drilling Company and, with the consent of the Lone Star Producing Company, was assigned by Coulston Drilling Company to LaCoastal Petroleum Corporation. LaCoastal Petroleum Corporation drilled the well as provided for in the agreement and made demand upon Coulston Drilling Company and the Lone Star Producing Company for an assignment of the lease covered by the farmout agreement. Coulston Drilling Company tendered an assignment to LaCoastal Petroleum Corporation which reserved twenty acres in the form of a square of the lease around a producing well which had previously been drilled by Lone Star Producing Company on the tract in question. Lone Star Producing Company, by way of cross-action, pleaded mutual mistake in the farmout agreement and alleged that LaCoastal Petroleum Corporation had notice of such mistake. The foregoing statement is taken substantially from appellant's brief. The Lone Star Producing Company says that the foregoing statement is substantially correct, except: (1) That appellee Coulston Drilling Company did not assign the farmout letter to appellant LaCoastal Petroleum Corporation, but that it did assign to that company 63/64ths of all rights acquired by "me (Coulston) in the farmout letter * *". (2) That the assignment tendered appellant LaCoastal by appellee Coulston did not reserve the entire interest in twenty acres in the form of a square around the producing oil well previously drilled by appellee Lone Star, but that it did reserve, in addition to that well, all leasehold rights and interests covering all of the oil and oil rights under the twenty acres in the form of a square.

All parties filed motions for summary judgment, and the Court sustained the motions for summary judgment filed by Lone Star Producing Company and Coulston Drilling Company, and entered a

judgment reforming the farmout agreement on the ground of mutual mistake. The Court denied the motion of LaCoastal Petroleum Corporation, and LaCoastal Petroleum Corporation has perfected its appeal.

The Court in its judgment and decree made the following findings:

"1. That at the time of the execution of the contract and/or farmout agreement dated April 9, 1962, Lone Star Producing Company was the owner of a producing oil well, commonly known and referred to as Lone Star Producing Company's Bryan Estate No. 2 Well, located in the southwest corner of the leasehold premises referred to in said contract and farmout agreement. That at the time of the execution of said contract and/or farmout agreement, it was understood and agreed by and it was the intention of Lone Star Producing Company and Coulston Drilling Company that there was to be reserved by Lone Star Producing Company and its successors and assigns from the operation of said contract and farmout agreement all rights, title and interest in and to the aforementioned well located on said premises, together with all leasehold rights and/or personal property, including the well, casing, pipelines, pumps, tanks and other equipment located on said premises or used and obtained in connection therewith, together with all rights in the oil and oil rights under twenty acres in the form of a square with the well located in the middle thereof as near as practicable surrounding such well.

"2. That through mere error in drawing said contract and/or farmout agreement, and as a result of a mutual mistake between the said Lone Star Producing Company and Coulston Drilling Company, the aforesaid reservation was inadvertently omitted from said agreement, and, therefore, the same did not represent the true intention and agreement of the aforesaid parties, and, accordingly, such contract and/or farmout agreement was erroneously drawn as a result of such mutual mistake between the parties thereto.

"3. That plaintiff and cross-defendant LaCoastal Petroleum Corporation paid no consideration whatsoever for either said well or the personal property used or obtained in connection therewith or the leasehold rights and interests covering all of the oil and oil rights under twenty acres in the form of a square surrounding the same, with such well located in the middle thereof as near as practicable. That the said LaCoastal Petroleum Corporation had full knowledge of the fact that it was the intention of the parties to such agreement of April 9, 1962, to incorporate the aforementioned reservation in the said contract and/or farmout agreement, accordingly, it was not an innocent purchaser for value of the rights so intended to be reserved in said contract and farmout agreement by Lone Star Producing Company.

"4. That said contract and farmout agreement dated April 9, 1962 be reformed so as to expressly incorporate therein and be made a part thereof the reservation hereinafter more particularly set out", and decreed accordingly.

■ The decree is challenged on 5 points and they are to the effect that the trial court erred: (1 and 2) In holding that the pleadings, depositions, affidavits and exhibits on file establish as a matter of law that there is no genuine issue of fact as to whether there was a mutual mistake made by Lone Star Producing Company and Coulston Drilling Company in drafting the farmout agreement, and that there is no genuine issue of fact as to whether LaCoastal Petroleum Corporation had notice and knowledge of the alleged mutual mistake; (3, 4 and 5) In failing to hold that there was no mutual mistake between Lone

Star Producing Company and Coulston Drilling Company in drafting the farmout agreement; and in failing to sustain La-Coastal Petroleum Company's motion for summary judgment, because there was no mutual mistake made in drafting the farmout agreement; and in failing to sustain plaintiff's motion, for the reason that the pleadings, depositions, affidavits and exhibits on file establish as a matter of law that plaintiff is a bona fide purchaser of the lease in question for value. We think we should say at the beginning that we are of the view that the factual situation here is ruled by the pronouncements made by our Supreme Court in Gulbenkian v. Penn, 151 Tex. 412, 252 S.W.2d 929; Tobin v. Garcia, 159 Tex. 58, 316 S.W.2d 396, and Gaines v. Hamman, 163 Tex. 618, 358 S.W.2d 557, and cases there cited. Since all parties filed motions for summary judgment, and the Court having granted appellees' motions and overruled motion of plaintiff, and since plaintiff has perfected its appeal to our Court it is our duty to determine all questions presented in the trial court. See Tobin v. Garcia, supra.

Plaintiff took and tendered in evidence the deposition of J. L. Toone, who (with the assistance of a Mr. Liles) negotiated this transaction for the Lone Star Producing Company, and the deposition of C. C. Coulston, who negotiated the matter for himself (with the assistance of Bob Ray, his geologist) and doing business as Coulston Drilling Company, and Richard B. Scurlock who negotiated the matter for LaCoastal Petroleum Corporation, and who was President of LaCoastal Petroleum Corporation at all times material to this transaction. (Neither Liles nor Ray testified by deposition). The affidavit filed in behalf of La-Coastal Petroleum Corporation was signed and sworn to by R. A. Graddy, President of LaCoastal Petroleum Corporation at the time the affidavit was signed, but he was not present at any of the conversations or any of the transactions between Coulston and Scurlock before or at the time the farmout agreement was executed. (Grad-dy did not testify by deposition.) So, it is without dispute that Graddy had no personal knowledge of the conversations between these parties leading up to the execution of the farmout agreement, or the making thereof, except that Scurlock did talk to Graddy about the prospect of making this deal with the Coulston Drilling Company (prior to the making) and that Scurlock pointed out the data that he had gained about that well; that he told Graddy at the time of his assumption that the well would be plugged; that he did not say anything to Graddy about the well or any acreage around the well being reserved.

It is clear from Coulston's deposition that this deal with the Lone Star Producing Company was negotiated by his geologist, Ray, (and a Mr. Liles representing the Lone Star Producing Company) and Ray brought it to his attention. Coulston testified in part, as follows:

"Q. And will you state please what the deal was as he outlined it to you?

"A. Well, we were to get a farmout of acreage in the Buffalo Field, and he stated to me that there was a producing well on this acreage and that Lone Star, their well was more or less a marginal well, at least the way he explained it to me, the way I understood it was a kind of a marginal well, and in working out the farmout if we could go up-structure and possibly drill and get a well up higher and get a gas well, that was our thinking on it.

"Q. Did he mention to you anything with reference to what would happen to that oil well that was on the lease?

"A. He said the only thing he knew was that they would possibly in the future—no date was ever mentioned to him or anybody else. That well would probably be abandoned if this other well was a commercial well, the one that we drilled.

* * *

"Q. Before the agreement had been been prepared, and you were just discussing the matter with Mr. Ray, did he say anything to you as to how or as to what would happen to this oil well in this deal?

"A. I just stated what he had told me.

"Q. That it would be abandoned?

"A. It would possibly. There was no date set. That was just mentioned. There wasn't any date set on when the well would be or would definitely be, just possibly be.

"Q. When you executed this farmout agreement, did you notice that there was nothing in it with reference to this oil well?

"A. Actually I didn't even think of it at all, because in our oral conversation to me the well had been mentioned, that it wasn't included in the farmout, and as far as me noticing it wasn't mentioned in the farmout letter, I don't remember even noticing that part of it.

"Q. In other words, you are talking now about your conversation with Mr. Ray that he mentioned that the well was not included in the farmout?

"A. Yeah, that's right.

"Q. You got that from Mr. Ray?

"A. That's right.

"Q. Did you personally ever talk to anyone at Lone Star about this trade?

"A. No, I didn't.

"Q. You handled it completely through Mr. Ray?

"A. That's right.

"Q. Then in the farmout agreement there's a statement to the effect that it's agreeable with Lone Star Produc-

ing Company that you assign an interest in this farmout letter agreement to Graddy Petroleum Corporation. Do you recall that?

"A. Yes, sir; I sure do.

"Q. Had you had prior dealings with Graddy Petroleum Corporation about this deal, or had Mr. Ray?

"A. With Dick Scurlock. We never talked directly to Mr. Graddy, no. The only contact we had was with Dick Scurlock."

\* \* \*

"Q. \* \* \* did you personally deal with Mr. Scurlock, or was that again handled through Mr. Ray?

"A. That was all handled through Mr. Ray.

"Q. You didn't have any personal dealings with Mr. Scurlock?

"A. I was present in the conversations, yes.

"Q. And were those conversations that you had with Mr. Scurlock before or after this farmout letter was executed?

"A. Well, I remember we did have a conversation before and possibly after. There was more than one time. I don't remember too much about just exactly what happened, but there was more than one time we talked on it

"Q. Where did those conversations take place?

"A. In my office.

"Q. And was anything mentioned at that time in those conversations about what was to happen to this oil well?

"A. Yeah, just like I told you while ago, same thing. The well was not included in the deal. The only thing, I assumed that possibly they were going to plug and abandon it. That's the

only thing I could go by that there was a possibility of plugging and abandoning it; just exactly when I didn't know.

"Q. Was that made known to Scurlock?

"A. Yes, that was made known to Scurlock.

"Q. And who made it known to him?

"A. Bob Ray.

"Q. Was that in your presence?

"A. That was in my presence, yes.

"Q. Do you recall what he said about that?

"A. No, I don't recall word for word. In other words, he he had geological information. He showed him the well on the map, and then had a location picked on the map that would probably be a better location. They were talking, and this well would be retained by Lone Star, and there was nothing definite they were going to plug it, but they said they would probably plug that well if we made a commercial well out of the gas well on the other well.

"Q. This is what Lone Star said to Mr. Ray?

"A. That's what Bob Ray told Dick Scurlock."

On cross-examination by Lone Star's counsel Coulston testified in part:

"Q. Mr. Coulston, from your testimony here, it appears that—and also from the Plaintiff's Exhibit 1, this letter, it appears that it was initially your understanding that Lone Star would reserve the production, equipment, salvage, and so forth from this Lone Star Producing Company No. 2, Bryan Estate marginal oil well. Is that correct?

"A. That's right.

"Q. Now, actually, insofar as the farmout agreement was concerned, would you say there was just a mutual mistake between the parties in failing to set out the reservation of that oil well?

"A. *That's the only thing I can— either assume that they had made up their mind to plug and abandon the well, or it was a mistake. Now, I couldn't swear which. I would have to assume whichever * * *"*. (Emphasis added.)

Counsel for Lone Star did not pursue this inquiry any further, and immediately went to another phase of the case not pertinent here. Plaintiff's attorney made no attempt to have the witness explain any further his answer: "I would have to assume whichever * * *", which appears to be incomplete.

■ Our view of the foregoing testimony of Coulston is that it shows that at the time he executed the farmout agreement he assumed that the Lone Star well would be plugged and abandoned if the well to be drilled by LaCoastal was a producer. As we understand his testimony he is saying that he assumed that Lone Star had made up its mind to plug and abandon the well, and that is the reason that the farmout agreement did not contain the reservation, and he likewise says in effect, that if Lone Star had not made up its mind to plug and abandon the well, then it was a mistake to leave it out. And, he said: "Now, I couldn't swear which. I would have to assume whichever * * *". We think it is obvious from the testimony quoted that insofar as the Coulston Drilling Company is concerned the trial court could not determine the question of whether there was a mutual mistake insofar as the Coulston Drilling Company is concerned without weighing the testimony of the witness Coulston, and that it could not do so under the authorities above cited. Coulston's tes-

timony covers some 22 pages, and we have given it (and this entire record) our most careful consideration, and we are of the view that we cannot honestly say that his testimony is without dispute that he, Coulston doing business as the Coulston Drilling Company, made a mutual mistake in accepting the farmout agreement as written. As above stated, we do not think the court could so hold without weighing his evidence. It is true that the Lone Star Producing Company in its pleadings (cross-action) and in its affidavit clearly sets out that it was the intention of the parties that the well and the equipment and the twenty acres were intended to be reserved by Lone Star. The Coulston Drilling Company in its original answer plead only a general denial. In its answer to the cross-action of the Lone Star Producing Company, it specifically plead that LaCoastal Petroleum Corporation knew that the well located upon the lands covered by the farmout agreement were not supposed to be included in said farmout agreement, or in any assignment from Lone Star of the leases. In its motion for summary judgment its specifically stated:

"that cross defendant LaCoastal Petroleum Corporation had full knowledge that the well located on the premises covered by said farmout agreement from Lone Star Producing Company, dated April 9, 1962, was not intended to be conveyed or assigned under the terms of said farmout agreement, even though said farmout agreement did not specifically except said well."

We find nothing in the motion of the Coulston Drilling Company, nor its pleadings, to the effect that it was the intention of the parties that the well, equipment and twenty acres were intended to be reserved by Lone Star. That leads us to say that we are of the view that the pleadings of the parties, as well as the affidavits, tendered an issue of fact as to whether this reservation was so made. The Coulston Drilling Company plead nothing in connection with a reserva-

tion of acreage around the well which would enable Lone Star Producing Company to continue the production of oil from the well, and that the failure to include it in the farmout agreement was a mutual mistake. We do think it is without dispute, and the parties admit that neither Coulston Drilling Company nor LaCoastal were to get the well. There is a material difference between these two positions. Lone Star contends in its pleadings that it was to have by way of reservation the well, equipment and twenty acres, which would enable Lone Star to continue production from this well. As above stated, as we understand Coulston's pleadings and deposition, they are to the effect that the well was not to be transferred to him. Coulston plead nothing in connection with the reservation of acreage around the well which would enable Lone Star to continue production from the well. We have previously quoted the testimony of Coulston as to his understanding, and we think his testimony tenders a fact issue.

Accordingly, we are of the view that the pleadings, depositions, affidavits and exhibits on file in this cause do not establish as a matter of law that there is no genuine issue of fact as to whether there was a mutual mistake made between Lone Star Producing Company and the Coulston Drilling Company in drafting the farmout agreement, and because of such view appellant's first point is sustained. That leads us to say that we have made a careful study of the pleadings, depositions, affidavits and exhibits on file in this cause, and we are of the view that the court cannot say that they establish as a matter of law that there is no genuine issue of fact as to whether LaCoastal Petroleum Corporation had notice and knowledge of the alleged mutual mistake, and being of such view appellant's second point is sustained.

It is our further view (because of the views heretofore expressed) that the trial court did not err in failing to hold as a matter of law that the pleadings, depositions, affidavits and exhibits on file estab-

lish as a matter of law that there was no mutual mistake between the Lone Star Producing Company and Coulston Drilling Company in drafting the farmout agreement, because the court could not do so without weighing all of the evidence tendered and, accordingly, appellant's third and fourth points are overruled.

It likewise follows that because of the views heretofore expressed, the trial court could not reach the question as to whether LaCoastal Petroleum Corporation is a bona fide purchaser of the lease in question for value and appellant's fifth point is overruled.

After a careful study of this entire record, it is our view that issues of fact are indicated by the record, and for that reason we refrain from further discussion of the record, and particularly the testimony tendered by the depositions and exhibits. Under the cases hereinbefore cited, this cause is reversed and remanded for trial on the merits. Reversed and remanded.